Next case of the morning is number 21-30475, Martin v. Turnipseed. Mr. Cascio, whenever you're ready. Good morning. May it please the court, Jason Cascio on behalf of Dr. Joseph Turnipseed as well as the Spine Diagnostic and Pain Treatment Center. To address the court's primary question, which we were alerted to as of late last week, I will address the initial point. We believe this court does in fact have jurisdiction over this appeal to review the district court's order that requires a treating physician to perform a patient audit to support his medical recommendations. What authority has ever said that there's an interlocutory appeal under collateral order for a routine, I'm not talking about the whole women's health or there's a First Amendment interest at stake, just a routine discovery dispute based on relevance and proportionality and overly burdensome. What case has allowed a collateral order in that type of routine everyday discovery dispute? To answer your question directly, I do not see one. However, we would draw a distinction in this case to say that this is actually not a routine discovery order. But you recognize that we've never allowed a routine discovery order to be brought by collateral order? I do, your honor. So what is your distinction? So in essence, it all starts with the distinction between the analysis under the case laws to who is a party and then who is not a party. And to take the court to the decision in AMARC, which was basically the adoption of Mohawk in the Fifth Circuit, the AMARC cites to- And AMARC was a non-party. That's correct. It was. Heritage was the non-party in that case. So what plays out there simply is the court says you, and it goes to the third element. So let's discuss the third element of the Cohen factors. Effectively, it's reviewable on appeal or not. So in that particular case, the court cited to the United States Supreme Court case of Firestone and said there's recognized methods of appeal for you as a non-party to go get sanctioned and then appeal the sanction. However, very interestingly, the circuit appeared to take a step back and didn't continue to cite the Firestone case, but rather cited to the case of it's the Church of Scientology opinion. It's the footnote 11 where the United States Supreme Court in that case acknowledged that a discovery order directed at a disinterested third party is treated as an immediately appealable final order because the third party presumably lacks a sufficient stake in the proceeding to risk contempt by refusing compliance. So in taking that step back and taking a look at what the United States Supreme Court case, this court in the Piratello matter, in fact, dropped a footnote adopting the Church of Scientology and acknowledged that there is a distinction no longer referring to Firestone. And in essence, what we see from there here in the Fifth Circuit really is. It was the case in 2018, Whole Woman's Health, and then in 2019, the Vantage case. Because in those two cases, this court appeared to be relying again that Church of Scientology really is the edict for how do you deal with a disinterested third party? You don't have to go get sanctions. Because in Woman's Health, as well as more importantly in Vantage, the court basically acknowledged what Mohawk stands for and then says, however, this issue of writ of mandamus is extremely narrow and this issue of contempt or sanctions is very risky. And then proceeded to say, we're going to move forward and allowed a third party for a party that has a serious issue like attorney-client privilege. I mean, that's a very serious claim. And the Supreme Court says you have these other alternatives, no collateral order. Correct. Mohawk dealt with parties. And so that's where I'm drawing distinction. Do you know any others since Mohawk? I mean, the Seventh, the Ninth. Do you know any circuit since Mohawk that has said it doesn't apply to non-parties? As it relates to just a standard run-of-the-mill discovery order? Your Honor, I accept that I'm not seeing that case law out there. Right. Because the concern is when it's such a routine discovery dispute that every day courts are saying, well, are they asking for too much? I'll narrow it. Or, you know, is this proportional? Those decisions are being made every day in this building by the trial court judges. And it would really open the door that I haven't seen any court open to allow interlocutory appeals. But you're only asking for a non-party, not a regular party that just doesn't like, I want to do five years, not 10 years. Absolutely. Because I think Mohawk... You're talking about a non-party that's being forced to do something. That's your distinction. That's correct. Because if I stand before this court as a party, I think Mohawk doesn't allow me to argue these issues. I think it's the fact that I'm a non-party because... So if we find no jurisdiction, what do you need to do then to get back to us? Here's the fascinating aspect. Firestone says I go, as a member of the bar, I go and recommend to a client to ignore Judge Brian Jackson in the Middle District of Louisiana, ignore his order. How counterintuitive is that, right? I mean, I have obligations and duties as a lawyer and I would make that recommendation to a client. Just go get sanctioned. But here's the additional risk I run with sanctions. There's two. There's two issues to this. I receive sanctions. I'm appealing the sanctions. So then I may have a right of appeal under the Mohawk of what parties can do. I can come appeal, but only if the sanction is, in essence, I can argue it in some fashion that it's a criminal sanction. So it's restricted in a sense. But here's the thing. If I come up on appeal with a sanction and I lose, guess what I'm going back to? I'm going back to a sanction that I, as a lawyer, made a recommendation to my client to take. So this concept – But that's true for a party. Say again? That's true for a party that immediately wants to appeal the attorney-client privilege. They have to risk a sanction. Yeah, but they're a party. That's a beautiful point. They're a party. That's – Just what the party gets at the end of the case. Dr. Turnipseed didn't ask to get into this case. And he doesn't want to end up in jail. No question. No question. But you agree that we'd be creating a circuit split to say that across the board a non-party can appeal any discovery order? I'm not arguing for that position, actually, Judge. Would you? I'm saying this is not a run-of-the-mill discovery order. Let him argue. Yeah. And I'll address it. It's time – You always do. You're so good at that. I do appreciate – Well, I just wanted to move on a little bit. Judge Costa, I'll address it because this is, I think, the distinction maybe your ears may be interested in seeing the position I'm taking here is that we do see this particular issue as it is a value of high order. It does imperil a substantial public interest if there's a delay. And this is what it comes down to. For the first time, we're seeing a district court order a treating physician. They have to justify their medical – future medical recommendations on their patient audit, on what their patients have done. That doesn't exist in medical school. It doesn't exist in science-based evidence. It doesn't based on knowledge, training, and experience. What you have is this paradigm shift that every treating healthcare provider out there now realizes. If I make any level of recommendation for future care, whether it's for spinal surgery, whether it's for just an epidural steroid injection, I have to go perform a patient audit to justify those recommendations. Really, we have an immediate chilling effect of treating healthcare providers having any desire to put their hand on a patient that's involved in litigation. This gives a district court the authority to order a non-party to create a document. Thank you, Judge. Not just to produce a document, but to create one. That was a point that would come to an argument on substance. I wasn't familiar with that. Thank you, and I was going to come to it on the appeal. But wasn't that done as leniency? I thought he said you have the option. If you don't want to actually produce this mountain of documents, you can just create a list. You've got to go do a patient audit. But you don't have to then also produce records. Right. It didn't change the problem of what was the maximum burden on us was this patient audit. We do not maintain these records in the regular course of business. So what we're stuck with is we have to create a document. In essence, perform a medical study, just like a peer-reviewed literature paper would do. Well, because the court found producing them was overburdensome. And so that's why the court found that you should create the document. But I wasn't familiar with the power to make a non-party create a document. I think it's overreaching, Your Honor. We don't have the document. In fact, we put that in. Non-expert, I should say. Absolutely. This is not a Rule 26 retained expert. This is a treating health care provider. And there is a distinction because retained experts do, under Rule 26, have to produce information and data they use to support their opinions. This is a treating physician who didn't choose any desire to be involved in this litigation. Okay, and then let me ask you this, because we give a lot of discretion in discovery. This case kind of brought back to my heart being a state district court judge where I couldn't get through a week without doing a bunch of discovery. But we don't get a lot of it here. So we give a lot of deference. But I'm wondering, is it a fact question or a legal question whether a doctor's recommendation, not being followed by a patient, puts the doctor's credibility in question? Is that a legal question, whether that does raise credibility, or is that a factual question as to whether that raises credibility? It may be difficult to distinguish the two, and possibly it's a mixed question. I tend to argue that that's going to be a legal question. The legal question, because the credibility that you want to assess of the treating health care provider, Dr. Turnipseed, you have to understand Dr. Turnipseed does not make his recommendations based on what other patients do. He makes his recommendations based on evidence-based medicine. If my doctor tells me to go lose 10 pounds and I don't, does that make my doctor not credible? That's their argument. Does it just make me like cake? Or if they told you to stop smoking and you didn't stop smoking. But if the plaintiff's lawyer is sending his patients to the same doctor and that doctor is repeatedly recommending this treatment that isn't being under— I mean, that's what's really going on here, right? There's an inference, whether it's supported or not, that this doctor is recommending people to inflate the damages that go into trial. That's what's going on here. That is the unsupported argument by the defense. No threshold showing whatsoever in any of this to establish that. Isn't that what the medical licensing boards are for? Absolutely. To file complaints. He is a board-certified physician who is recognizing good standing and losing state board of medical examiners. That's correct. In Texas, at least, there is a very, very vigorous inquiry into all those kinds of complaints. And I assume that's the case in Louisiana. Right. And there's not— Well, and how does this discovery prove that? In other words— It doesn't. He could be making these recommendations. I mean, the reality is if he makes these recommendations to people who don't have a lawsuit and don't have insurance, they aren't going to do it because they don't have the money. But if he is, in fact, only making the recommendation to Attorney X's clients, that would be easy enough to show a different way. I don't understand how this document that says I recommended it to 20 patients and only five of them got the treatment— It's not relevant. —how that would prove that the other 15 were clients of Attorney X. And Judge Haynes, to take it one step further in pulling your thought process back even a bigger step, it's not relevant on this simple point. If a patient didn't come back and have the treatment recommended, you don't know why. And until you know the answer to that question, there is zero relevance to this patient audit, which I've gone to great lengths in my briefs to try to establish to the court. You have to know why the— In fact, what's your jurisdictional rule? Because you said in response to my question you're not asking for an across-the-board statement that a non-party can always pursue under the collateral order doctrine. So what is the limiting principle, just that this is so extreme, this discovery order? Your Honor, much in the same way that the Vantage case was a scenario of significance and of importance, which we're asked to evaluate under the third element of Cohen— How would you articulate the rule? If it's not an across-the-board right of non-parties, what is the rule that allows this one? Well, under this scenario, this is a very unique circumstance. You're telling all treating health care providers involved in litigation, for any recommendation you make for future care, you have to back it up with a patient audit. So what if it's a law firm or an accounting firm that gets a third-party subpoena? Would they be able to appeal? So I think there's a very narrow— I'm trying to find out what your limiting principle is. Right. My limiting principle is the important public policy here is you're going to have a chilling effect on treating health care providers wanting to be involved in litigation at all because this issue of a patient audit doesn't fall under the normal course of medical care. It's not relied upon whatsoever. What the reliance on recommendations is is evidence-based medicine, not what other patients may or may not have done. So your jurisdictional rule is medical third parties should be treated differently? Under the scope of what the district court has ordered, yes, because of the important public— and I'm running a little slow on time, but I want to get to why it is so important, why this is an important public issue. Because we can't answer that question, Judge Haynes, about why did you not come back for the care or treatment because that particular patient might have actually gone to a doctor, another doctor to do the treatment. They might not have had the money. I put that as a different category. They might have died. That's how we don't see them. Because they didn't get the care. But what about the patients who actually had the treatment, just didn't do it with us? We have to get on the phone and call these people. And this is the public interest. It's a pain management doctor, right? It's a board-certified anesthesiologist pain management, correct. So if someone actually gets the surgery, the idea being to reduce the pain, wouldn't that reduce the pain management that's being given? This treatment is the alternative. This treatment is the alternative to not have to have spinal surgery and change your anatomy because it's starting to be recognized changing your anatomy may not really be the cure. But again, the point is we have to call these patients who are no longer under our umbrella. Well, guess what? That's a very intrusive phone call. Number two, that patient is protected by HIPAA. Thank you. Thank you, Judge. We can't even give the most important information. That's the public policy. And that's why I believe this case is distinguishable from just a garden variety discovery order. But you wouldn't care if we ruled garden variety that it's a collateral order when it's a non-party. Recognizing the high court, my reservation in just saying yes is I recognize the sensitivity to the collateral order that the courts want to maintain it to be restrictive. Well, you say that because you're a non-party, the district court's order is effectively unreviewable on appeal. I do agree with that. Okay, well. I do agree with that point, yes, for us. For us, yes, that is correct. I will reserve time for reply. Thank you, Your Honors. Thank you. Mr. Schaffer. Good morning, Your Honors. I want to address the jurisdictional argument. And Judge Costa, I think you hit the nail on the head. There is no law, there is no case that says this is an appealable collateral order. How many cases say it's not? Well, Judge, with all due respect, approving a negative often is regrettable. The Seventh Circuit, the Ninth Circuit, our opinion in Amark Auction Galleries? Yes, Amark Auction Galleries. Why don't you argue it in your brief? Well, to be very frank with you, Your Honor, you brought this up at the last – this was brought up only to our attention recently through the court. But the general rule is that in this circuit, is that discovery orders may not be appealed under Amark. And as you pointed out, Judge Costa – Well, what about WEWA? Well, WEWA, Judge, I don't think – in WEWA what happened was a little different. WEWA involved a situation where – first of all, I think WEWA involved complicated – let me get to WEWA. They said they had jurisdiction over the denial of a discovery order directed to a non-party in that case who was a party in another case in an underlying lawsuit pending in another circuit. So obviously WEWA is very different. There's not competing matters here.  So if you represented Dr. Turnipsey, would you tell him to commit a violation of the court order and go to jail so that he could appeal it? Well, Judge, I don't know if he would go to jail. Would I think – He could. Well, obviously he could. Violate a court order. You can go to jail. You can be fined. I mean, a lot of things can happen. But that is one option. What the jurisprudence has said – and this is – I'm not saying if I agree or disagree with it. I'm simply saying what the course has said is that you have to then decide either you're going to obey the order or you're not going to obey the order. If you don't obey the order, there are certain consequences. Obviously, some of those can be draconian. But that is what the jurisprudence has held up to this point. Okay. So let me ask you this. Let's suppose that Turnipsey did comply, produced all of this stuff, and the plaintiff ended up winning, Leonard ended up winning. Then can he appeal? And what is he appealing exactly? Let's say you don't file an appeal. Leonard won. You guys pay it off. He then can file the appeal. It's a final judgment. Are we going to say, say what? This was three years ago that you gave this stuff. She won anyway. It was all irrelevant. Why are we here? So when are we going to review this information in this case short of putting Dr. Turnipseed in jail or being sanctioned? Well, I think we're assuming, one, that he would not comply with the order. But if he decided not to comply with the order, probably contempt is, if he was put in contempt, that would be reviewable at the end of the case. You think this discovery is very important. You would move for contempt, wouldn't you? I'll be very frank with you, Judge. I don't know. Probably would move for some sort of court order.  Exactly. Lots of money. Well, obviously disobeying court order is never a good thing, Judge. So I would obviously move however I had to in those circumstances. And there's no recourse. Well, there would be recourse for him at the end of the case. Because that's what I'm asking. He complies. What happens then? He complies. Then the case goes on for years and years. It comes out. Maybe it even settles. And the court issues a dismissal with prejudice for settlement. He's got to keep watching the newspaper or whatever every day, looking for that. And then, boom, he shows up and he goes, hi, I'm the appellate. And we're like, who are you? You didn't have anything to do with this. You did what you did. And here we are. So when would it be appealable? As a practical matter. And how would it be appealable by him? As a practical matter, Judge, I think if the plaintiff prevailed in the case, he would probably never appeal. It is a matter of practicality. The only thing that we're asking for here, what the judge actually authorized, were stats. There is, and there was something that bothered me earlier when it was said about HIPAA. HIPAA is not implicated here. These are statistics that are wholly bereft of any PHI or any information required by HIPAA. The implication is, all he says is, I gave this advice to 20 patients and only three of them got it from me. He's going to want to find out what happened to the other 17. Did they all go next door and get it done? Did they all die? Did they all not have the money to get it done? We don't know. You seem to think it matters that they don't get it done, but I think it matters why they didn't get it done. And that's where HIPAA would come in. So if he doesn't do that, you just have information that I don't see how that, well, let me just ask you this. How does that show he's not credible? If he gave that advice to a bunch of clients and they didn't follow it with him. That's all we know. They didn't follow it with him. We don't know if they followed it with someone else. They died. Something else happened. Well, let me back up a little bit, and I'm going to get your question, Judge Haynes. First of all, I was a little bothered by this treating physician. I get under the law, strictly speaking, he is a treating physician. But treating physician evokes for a lot of people someone, and I saw some very old cases a long time ago, it said someone you've had a longstanding relationship. My own primary care doctor until he died when I was 46. Give me a break. Give me a break. That is not modern medicine. Modern medicine, I've had my internist for 25 years. But if something's wrong with my ear, he sends me to an ear doctor. If something's wrong with my private parts, he sends me to a gynecologist. Don't tell us about 80 years ago. I get that, Judge. My point here is, is that someone who comes in who is only treating someone after litigation, who is repeatedly under West's law, appears as an expert. But this is, I don't understand why you couldn't cross-examine this expert. It's quite standard practice. How many patients have you had? How many patients have you recommended? I mean, pain management is a recognized specialty, and I have no doubt that some doctors abuse it and so on. But if you, there are two ways to get at this. One of them is serious cross-examination. Another way is to file a complaint with the medical board. Well, let me address both of those issues. The first thing about serious cross-examination, Dr. Turnipseed, in his brief, already basically said he doesn't know. So what I'm going to get in cross-examination is I don't know the stats. So you ask him, how often have you been consulted by plaintiff's doctors, plaintiff's lawyers? How often has so-and-so, the plaintiff's lawyer here, referred you to a number of patients? And then you go down the list of other well-known plaintiff's attorneys. Has so-and-so referred you? Has so-and-so referred? There are ways to get at this that don't ask them to a patient audit. Well, let me address that. Number one, though, whether or not they're aligned with plaintiff attorneys, or they have a lot of plaintiff cases, is different from this data. This is a separate piece of data. And here, I'm then stuck with this. I've deposed, not Dr. Turnipseed, but other doctors who say, I don't know. I'm just treating people all day. Well, then you're not asking the right questions. Yes, Your Honor, I believe I am, because they simply will say, I don't know, over and over again. I understand that, but you're not asking all these other questions. And if you really think these doctors are engaging in needless practice of medicine, my understanding is that any party can make a complaint to the medical board, at least I happen to know that's the truth in Texas, any party, and can get an investigation started about excessive or practice of medicine without reasonable basis. Well, I have some concerns. Once again, Louisiana, I'm not aware of that practice. Number two, in Louisiana, I feel I would be violating ethical canons if during the pendency of an action, I bring a complaint against a doctor about something I don't have. That's what I'm trying to get here, is the underlying facts. We don't know them. And, you know, one thing I'd like to. I don't understand. If he fully complied, what you would know is that he made this recommendation to 20 patients, and three of them, five of them, 20 of them got it done by him. That's all you would know. You wouldn't know whether they had lawyers, whether they had litigation, whether they were 100 years old or 20 years old. You wouldn't know any of that. You wouldn't know why the ones didn't follow. I mean, what about my hypo to him? My doctor tells me to lose 10 pounds, and then I don't. Does that make my doctor an incredible, non-credible, bad doctor? Let me get to that. Number one, Judge, is that, first of all, we're trying to get the numbers here. Number two, you're not getting a recommendation for purposes of litigation, and so what this doctor is going to do is he's going to say, and we're getting a little ahead. This is for discovery. I think your questions go more toward admissibility at trial. No, it goes to the question of whether this discovery will bear upon. The only thing the judge found that made this relevant is it will bear upon the doctor's credibility. And if my doctor said, not just lose 10 pounds, but I have a special nutritionist who's not very expensive, please go to this nutritionist and whatever, so that you could say the doctor might benefit from it. But actually, this nutritionist is great, and everybody who goes to the nutritionist does lose the weight, but I just don't do that. Does that make the doctor not credible? Well, I think that's a, if I may, with all due respect, I think that that hypothet is a little, is not applicable, and let me tell you why. Here, this doctor is going to get up on the stand, and he's going to say, more likely than not, these future medicals are needed, and they will be incurred. We have a right to know, because if he knows, if he is doing this regularly. How can he say they will be incurred? I mean, he can say, I hope they will be incurred. Well, under the medical standard, he'd have to say, more likely than not. More likely than not, they're needed. So my doctor could say, I need to lose 100 pounds. God willing, I don't. And in most cases, that's a really important recommendation. But a lot of people don't follow that. Same with smoking. Same with a long list of things that you don't do. Go every year and get this certain test done. Okay? How many people follow that? So many don't. Does that make the doctor's recommendation to go get an annual mammogram, an annual whatever, does that make that not credible? Or does it just make the problem that we are all free adults, free to do what we want? The difference, Judge, is they are seeking money for this. They're asking a jury. They're telling the jury they're going to go do this. The patient's not saying they're not the patient. The plaintiff is saying, I'm going to go do this. So if the doctor's recommended 200 people, and all 200 he can show actually did have the surgery, that makes him quite credible in saying this is a necessary thing. If, conversely, none of the 200 people he can show ever did it, that's going to raise some eyebrows, isn't it? Yes. And if the doctor himself knows, let's say, okay. Why can't you put your own expert on, and then they'll file the same request on your expert? Well, first of all, my expert, Your Honor, well, that would be an IME. And once again, we get into the battle of the experts at that point. You're damn right. Pardon me. But you are right, because that's what I understood most of these Med-Mal cases to boil down to, the respective credibility of the experts. And everybody knows that there are some doctors who the majority of whose practice is with plaintiffs, and there are some doctors the majority of whose expertise is testifying for the other side. And what you're really precipitating here is a war of irrelevant data on both sides. Well, Judge, if I may, on this one, this is not a medical mal case. This is a personal injury case. Same. Number two. Same thing. Whether or not my – if we had an IME, to be very frank with you, so many charges already allowed by the law that basically say the jury can almost ignore his opinion now, you know, the weight of the treating physician is given more weight than that of an expert only retained for litigation. Well, life is hard. You're in the defense business. So is my sister in Texas. So I understand that side a little bit about that. But it's still your expert versus their expert. Well, but I don't think – but then their expert should have to be able to justify why he's recommending this. You're going to burden the medical profession with this because you cannot confine this non-appealability to simply what you regard as aberrant doctors who testify for plaintiffs. They are going to do the same thing. Doctors are supposed to be treating patients. As you well know, they are overburdened with paperwork in the world as we live right now. And what you're saying is, oh, for the sake of defeating this judgment, we've got to get into all their records. I do not agree, Judge, and I'll tell you why. This is not going to end up with a family doctor if he recommends an appendectomy to someone that suddenly we get into that. Why not? Judge Turnipseed, why not? Why not? Because appendectomies right now don't have future life care plans, Your Honor, that are over six figures. We have a right to know if that's six figures. You're talking about neurosurgeons. You're talking about oncologists. You're talking about osteo- Yes, but, Judge. Staying in the hospital if you don't have insurance is quite costly. So I disagree with the notion. You're talking about diabetic treatment. You're talking about Guillain-Barre syndrome. You're talking about epilepsy. There are many, many, many chronic-type problems that many specialists have to treat regularly. I would pose this question, though, then. It's hypothetical, obviously, Your Honors. If you were a doctor and you saw that you were making a recommendation that people are getting money for repeatedly and that no one ever returns to you for it, wouldn't that cause you some concern that maybe your treatment, either they're never following it, they maybe really aren't ill, or some other factor? If they're not really, if they're not, quote, following it, that either means you have no interpersonal skills in persuading them, or it may mean they're not really injured to begin with. But, but this kind of doctor in the pain clinic business has to rely on the credibility of the patient who comes for him or her. But, Judge, they also have to rely on what they see. But that's – They can't close their eyes. If they see that no one's ever coming back, this has to have some – and to me, Your Honor – Well, that would suggest to me that they wouldn't lie about it then. Because they're not benefiting from it. So to me, the notion that this proves credibility, that you don't do what your doctor told you to do, or specifically, you don't tell the doctor you did what your doctor told you to do, and you're talking about an expert, meaning not your primary care, so some other person, like Judge Jones' hypo of going to the ear doctor, the ear doctor may not know. He may say, go get a hearing aid. He doesn't know if I got it or not. That doesn't mean that his advice wasn't good. Well, first of all, the doctor is profiting from it because he's getting a lot of patients sent to him so that he can make this future recommendation, and then he can have a life care plan, and they're sent on their merry way, and they get six figures for treatment they know they'll never get. But here's the thing. You're not going to be able to prove that with this set of facts. All this proves is that he made the recommendation to X number and Y number got it. It doesn't prove that they were all personal injury plaintiffs. It doesn't prove why they didn't. So when you say, why didn't they get it, he has to say, I don't know. And the opponent can go through every list of things that might have been the case. They went to someone else. They died. They were afraid. They were this. They were that. Were they all personal injury plaintiffs? I have no reason to think that, you know, on and on. So why this proves credibility is what I'm concerned about. Well, I believe it does, and I'll tell you why. Once again, if, and it goes to what the magistrate judge said, and I think it does lead, once again, we're getting a little ahead. We're talking about trial evidence right now, right? This is for discovery purposes. It is for discovery purposes. The only relevance of which the magistrate judge found was addressing the credibility. So, yes, it does matter. You can't just go get random discovery. It has to have some relevance. And the only relevance the magistrate judge articulated was that it addresses the credibility. So that's why I'm asking how it does. That isn't, Your Honor, he said, and to challenge plaintiffs' alleged damages. There were two reasons. Okay, but the plaintiffs' alleged damages are based on the doctor's credibility. So that's the only. It's also based on, are you ever going to undergo this treatment? I mean, I think Your Honors would agree. Okay, but that's asking the plaintiff that. I think Your Honors would agree that should a litigant be compensated for something they're never going to get, it becomes a windfall. Okay, this is what the magistrate judge said. That's the merits, isn't it? That's, I'm sorry. This information. That is the merits, but I'm talking about as a matter of policy right now. Okay, this information is relevant for the purpose of challenging Dr. Serpency's credibility, which ultimately concerns the scope of recoverable. So it's credibility is what this is addressing. That's all the magistrate judge found. So that's why I've been trying to figure out how it does prove or disprove the doctor's credibility, because so many people go to doctors and don't follow what they say. And it's a scary thought to me that these doctors are all going to now be called non-credible, uncredible. But they're not. Dr. Turnipseed, since 2007, has appeared in Westlaw 25 times. This is not some family doctor who suddenly his practice is going to be overburdened. Okay, and you can't cross-examine him about that? Yes, but I also have a right, Your Honor. This is the data underlying his conclusions. If we do that, I guarantee you what will happen is that he will say, I don't know. I have no idea. I have no idea. I have no idea. And we'll be stuck with that. And the jury still has 25 Westlaw citations. And I'll bet you're very capable. I bet you can capitalize on that. Maybe, or have you, if it's appealable. Yes, Your Honor. Thank you, Your Honor. Mr. Cascio-Rubetto. Thank you, Your Honor. I do want to address the issue of future medical care and the standard under Louisiana law. I don't really care what the standard is under Louisiana. I'm not sure about my colleagues. Judge Jones, it was only because an issue came up during the dialogue here. There was the suggestion that Dr. Turnipseed is predicting that the patient will actually have the care. That's not what he's saying, nor is that the standard required of him. All he has to say is at the front end, I'm making my future recommendations based on what I believe is reasonably necessary. And all that depends on the credibility of the person who complains of pain, right? Right. Plus subjective factors. That's one of the elements. Absolutely. And the other side can ask your client, I mean, not your client, Leonard, are you going to go get this done? Are you going to go get these treatments? They can ask her that, right? The parties in the lawsuit can ask her that, but Dr. Turnipseed, all Dr. Turnipseed does – No, no, I'm saying can they ask her? Of course. He goes to trial. He says I recommend this, blah, blah, blah. I don't know who's followed the recommendations. I don't know if she will follow it. Then they can ask her, are you going to follow it? And then she has to answer that. And I mean she can lie or tell the truth, but that is all part of what trials are all about. Ms. Leonard is the keeper of the keys. That's exactly right. Dr. Turnipseed doesn't weigh on that whatsoever or at all. So what the court recognized there in that dialogue with defense counsel is this real paradigm shift in discovery because this would not stop with Dr. Joseph Turnipseed as a treating physician. The exact same discovery would now be propounded on I.M. Eath, independent medical examining physicians. Same question. You do a patient audit for every time you said this patient really didn't need the care but went and got it because they needed it. So this patient audit doesn't stop with Dr. Turnipseed. And it also doesn't stop with the I.M. Eath or independent medical exam physicians. It goes to the life care planners too. Now life care planners are going to get this discovery that says go do a patient audit to show that every time you were making the recommendation for future medical care that the patient actually underwent the care. This does not exist under Louisiana discovery law. Do we want to have all those appeals? Judge, I don't want it to exist in discovery. I'm a defense lawyer. I've worked with health care providers for 24 years. I've defended them as treating physicians. I've defended them as performing independent medical exams. I've defended them in medical malpractice cases. I've dealt with life care planners. I don't want this in our system whatsoever. This would be horrible to the system. So if we were to rule that there's no jurisdiction, would you bring a mandamus? Would you wait for the end of the case? Would you send your client to prison? What are you going to do? I fret the thought process that I have to go down that path because really what I'm stuck with is if I make a recommendation to not follow Judge Jackson's orders, it's possible that he doesn't put him in jail. And if he doesn't put him in jail, I have no right to appeal because I have to argue that the sanction, 300 bucks, I can't say that's criminal in nature. So I don't know that I have that right. I think it's also recognized by this court, even Judge Costa, is that the writ of mandamus really is not an available option for me because of the incredibly high standard associated with it. So what we are left with is a ruling now. People do prevail on privilege claims. Under Mohawk, they now have to bring privilege claims under mandamus, and that is one area where mandamus is commonly granted even though in most cases it's not. We don't have that here. Under privilege. I don't have a privilege argument. Probably you have the same arguments about the importance of your claim. I think I would defer back ultimately to the Fifth Circuit's acknowledgment and advantage that it's really not a reasonable or an effectively reviewable issue. May I ask about the WeWa case? Certainly. So WeWa is kind of the other way around. It was the court said, I'm not permitting the discovery, if I recall WeWa correctly. Well, who cares? What's the diff? I mean, you know, you're either denying it or you're saying it. Because the party who was affected, who was said, who got denied it was a party. So they, you know, I don't understand how it plays out. Yes, but what it says is in AMARC we held that a court order granting discovery directed at a non-party was not immediately appealable. Despite our reservation, we had previously held in N. Ray Rubin that we have jurisdiction over the denial of a discovery order directed to a non-party. And then it goes on about N. Ray Rubin. I think ultimately in WeWa and to cite to the exact page, I think it was at 817 where they described the other court, the second circuit court, because I believe this was an ancillary proceeding. It was. Well, I'm talking about the jurisdictional ruling. And it is. It goes to this point, and it's the third element of Cohen, that the second circuit really has no authority to upset a discovery order entered by a district court in this circuit. So it ties into the fact that it was an ancillary proceeding. Well, but that just means whether it was collateral. That's what it was. Right. I agree with the court. Right. And so I think ultimately we're left with the direction the court provided us in women's health as well as Vantage. Let me just say I know my argument is over. I greatly appreciate the opportunity to be here today. I realize coming off the pandemic what a challenge it has been for all of us to wear these masks and do this. Recently I was in court in downtown Los Angeles, California. And I just relish the opportunity to do this and to be challenged as a practitioner. And obviously you do, too, from what I saw today. So thank you all very much for this opportunity. I hope you both have a safe trip back to New Orleans. Thank you. Again, thank you all very much. All right. We have concluded the arguments for this morning, and we are adjourned.